## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYAND
## GREENBELT DIVISION

IN RE JACQUELINE K. PIETERSE      : CASE NO. 20-17425
         Debtor                  : CHAPTER 11
                                   : JUDGE RUARK
                                   :

---

JACQUELINE K. PIETERSE              :
       8751 Pete Wiles Road           :
       Middletown, Maryland 21769    :
                                   :

JEFFREY M. CAHALL                  :
       8751 Pete Wiles Road           :
       Middletown, Maryland 21769    :
                                   :

            Plaintiffs             :

           vs.                    : Adversary Case No. _____

GORDON & SIMMONS LLC           :
       1050 Key Parkway, Suite 101   :
       Frederick, Maryland 21702     :

SHAWN P. CAVENEE, ESQ.          :

       1050 Key Parkway, Suite 101   :
       Frederick, Maryland 21702     :
                                   :

JACOB I. WEDDLE, ESQ.            :
       1050 Key Parkway, Suite 101   :
       Frederick, Maryland 21702     :
                                   :

CHARLES E. REMUS, II, ESQ.      :

       1050 Key Parkway, Suite 101   :
       Frederick, Maryland 21702     :
                                   :

BENJAMIN J. ANDRES, ESQ.       :

       111 Rockville Pike, Suite 800   :
       Rockville, MD 20850          :
            Defendants        :

U.S. BANKRUPTCY COURT
DISTRICT OF MARYLAND
GREENBELT
2021 NOV -5 PM 2: 55

1

## ADVERSARY COMPLAINT

Come now Jacqueline K. Pieterse, Debtor-in-Possession and acting pro se ("Pieterse"), and Jeffrey M. Cahall, co-Debtor and acting pro se ("Cahall"), collectively referred to as "Plaintiffs" and respectfully bring this Adversary Complaint against Gordon & Simmons LLC ("G&S"), Shawn P. Cavenee, Esq. ("Cavenee"), Jacob I. Weddle, Esq. ("Weddle"), Charles E. Remus, II, Esq. ("Remus") & Benjamin J. Andres, Esq. ("Andres"), collectively referred to as "Defendants", and for causes of action and claims of relief allege as follows:

## JURISDICTION AND VENUE

1.       The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §157(b), §502, §1331, §1334(b), among others, Federal Rules of Bankruptcy Procedure ("FRBP"), Rule7001(2), and (9), and Federal Rules of Civil Procedure ("FRCP") Rule 60(3), (4) and (6), among others;

2.       This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §157(b) (2) (A), (B) and (K).

3.       The venue of this action in this district is proper pursuant to 28 U.S.C. § 1408, among others;

## PARTIES

4.       At all times pertinent hereto, Plaintiffs both resided in Frederick County, Maryland and reside at 8751 Pete Wiles Road, Middletown Maryland 21769 ("Property");

5.       At all times pertinent hereto, Gordon & Simmons, LLC has a law firm organized under the laws of the State of Maryland with its offices located at 1050 Key Parkway, Suite 101, Frederick, Maryland 21702.

6.       At all times pertinent hereto, Cavenee was an attorney licensed in the State of Maryland and a partner with G&S, with his primary offices at 1050 Key Parkway, Suite 101, Frederick, Maryland 21702;

7.       At all times pertinent hereto, Weddle was an attorney licensed in the State of Maryland and a partner with G&S, with his primary offices at 1050 Key Parkway, Suite 101, Frederick, Maryland 21702;

8.      At all times pertinent hereto, Remus was an attorney licensed in the State of Maryland and an associate with G&S, with his primary offices at 1050 Key Parkway, Suite 101, Frederick, Maryland 21702;

9.      At all times pertinent hereto, Andres was an attorney licensed in the State of Maryland and an associate with G&S, with his primary offices at 1050 Key Parkway, Suite 101, Frederick, Maryland 21702;

## COMMON FACTS

10.      After an introductory meeting at G&S's offices between Plaintiffs, Cavenee and Weddle, on or about March 1, 2017, G&S provided Plaintiffs, and two related business entities, HMRP, Inc. ("HMRP") and TD Healthmed Realty Partners -Robinwood, LLC "TD-Robinwood") with a retainer agreement ("Agreement") wherein G&S agreed to provide legal representation and services to Plaintiffs regarding a lawsuit that had been filed against Plaintiffs by Tyler Donegan Real Estate Services, Inc. ("TDD") and TD Healthmed Realty Partners, LLC, a 100% owned subsidiary of TDD, ("TDLLC") (hereinafter collectively referred to as "TDD"). Plaintiffs executed the Agreement and returned same to G&S's offices on or around March 3, 2017, along with a retainer payment as required by the contract. The Agreement is attached hereto as Exhibit A.

11.      G&S, Cavenee and Weddle subsequently enter their appearances as counsel for Plaintiffs and the two corporate defendants in Case No. 10-C-17-000401 (see below);

12.      TDD was at all times pertinent hereto a real estate brokerage company formed under the laws of the State of Maryland. Chadley S. Tyler ("Tyler") was at all times pertinent hereto a licensed real estate broker in the State of Maryland and TDD's founder, president primary stockholder and broker of record. TDD was the corporate vehicle through which Tyler elected to provide brokerage services under his broker's license as provided for by Maryland statute;

13.      The complaint filed by TDD ("TDD") against Plaintiffs ("TDD Complaint") was filed in the Circuit Court for Frederick County on February 14, 2017 and was assigned Case No. 10-C-17-0000401. The TDD Complaint is attached hereto as Exhibit B.

14.      The TDD Complaint was based on an alleged employment contract between

3

TDD and Cahall, wherein TDD engaged Cahall to provide real estate brokerage services on its behalf in return for a percentage of commissions and fees earned from such services and every cause of action in the TDD Complaint was intertwined with and had a direct nexus to this alleged employment contract. See Paragraph 10 of TDD Complaint which states:

> "On December 1, 2009, Cahall was employed by Tyler, Inc. as a real estate professional in business development. Soliciting and securing customers and business were part of his ordinary duties."

15.     The first count in the TDD Complaint was for Breach of Employment Contract against Cahall. The remaining five counts within the TDD Complaint were for Interference with Contracts, Interference with Prospective Advantage, Conversion and Civil Conspiracy against all defendants therein, and Accounting against Cahall;

16.     At no time during the introductory meeting between Plaintiffs and G&S referenced above, or thereafter did G&S inquire as to whether TDD was a licensed brokerage company or whether Cahall was a licensed real estate agent or broker, nor did G&S conduct any investigation as to the licensing status of either TDD or Cahall;

17.     On or about November 30 and December 1, 2017, Cavenee took the deposition of Tyler. At that time, Cavenee did inquire as to whether Tyler and TDD were licensed to provide real estate brokerage services in Maryland to which Tyler responded yes. However, Cavenee did not ask Tyler if Cahall was licensed to provide real estate brokerage services in Maryland. Tyler went on to testify during his deposition that Cahall was hired to perform real estate brokerage services for TDD and did so continuously from 2009 through 2016 and that TDD paid Cahall a share or split of the real estate commissions and fees earned from these real estate brokerage services through the 2009-2016 period;

18.     After reviewing a transcript of Tyler's deposition, Cahall emailed Cavenee on December 14, 2017, and sought Defendant's advice with respect to the outlines of a possible settlement agreement with the plaintiffs stimulated by the fact that TDD had engaged Cahall to provide real estate brokerage services on TDD's behalf and agreed to pay Cahall a split of real estate commissions TDD earned therefrom, all with TDD having the full knowledge that Cahall did not possess a real estate license;

19.       On December 19, 2017, Cavenee responded via email to Cahall December 14 email. Cavenee stated that he had met with Remus to review Remus' research and assist Cavenee with providing Cahall a response. As a result, and in summary, Cavenee informed Cahall in the email that because TDD's violations of MD. Code Ann. Bus. Occ. & Prof §17-601 (prohibiting providing brokerage services without license) and §17-603 (prohibiting a real estate broker from retaining an unlicensed person) were misdemeanor offenses, G&S was ethically barred from advising or assisting Cahall with any settlement offer that included threatening the opposing party with criminal prosecution to gain an advantage in a civil matter. Cavenee's and Remus' position was that TDD's violations of these laws by engaging Cahall to provide real estate brokerage on TDD's behalf did not pertain to any conduct related to the civil matter between TDD and Plaintiffs, a civil matter based on TDD's real estate brokerage employment contract between TDD and Cahall;

20.       At no time did Defendants advise or inform Cahall or Pieterse that TDD's violation of the aforesaid Maryland statutes, among others that TDD violated by engaging and compensating Cahall, rendered the employment contract between TDD and Cahall illegal, void ab initio and unenforceable under Maryland law, permanently tainted all other causes of action brought by TDD and meant that TDD had come before the court with unclean hands;

21.       At no time did Defendants inform Pieterse about these discussions with Cahall regarding TDD's criminal misconduct as referred to above nor did Defendants cc Pieterse on the December 19, 2017, email response to Cahall;

22.       On or around March 26, 2018, Cahall again raised the issue of TDD's criminal misconduct and violation of statutory law by engaging and compensating an unlicensed person to provide real estate brokerage services on its behalf as leverage to negotiate a settlement with TDD via email to Cavenee;

23.       On March 26, 2018, Cavenee responded to Cahall via email and reiterated Defendants' refusal to assist or advise Cahall with any negotiations that involve TDD's criminal misconduct and statutory violations and attached for Cahall's review again, Cavenee's December 19, 2017, email referenced. In addition, Cavenee stated that before providing Cahall with this email response, Cavenee had consulted with his "partners and [Remus] to get their input.";

24.    Again, while Defendants were focused on their own perceived "ethical" responsibilities, Defendants failed to advise or inform Cahall or Pieterse that the facts clearly rendered the foundation of TDD's case, the alleged contract between TDD and Cahall, illegal, void and unenforceable, etc.;

25.    Again, the email sent to Cahall by Cavenee on March 26, 2017, was not sent to Pieterse nor did Defendants inform Pieterse of the ongoing discussions with Cahall and any potential settlement offers or TDD's criminal misconduct or the illegality of the alleged employment contract between TDD and Cahall;

26.    Yet a third time on or about May 7, 2018, Cahall again emailed Cavenee to discuss the proposed settlement offer referencing TDD's criminal misconduct and statutory violations in engaging and compensating the unlicensed Cahall to provide real estate brokerage services for TDD, the same general proposal that they had communicated about in December 2017 and March 2018;

27.    On May 9, 2018, Cavenee sent Cahall an email and again advised Cahall that he could provide no advice or consultation to Cahall regarding the proposal and instructed Cahall to:

> "[N]ot show a copy to me on any communications with Tyler, as it may lead Tyler and/or his counsel (who I suspect will be provided with a copy of your proposal not long after it is communicated) to conclude that I or Gordon & Simmons had some part in the decision to make the offer."

28.    And yet again for the third time, with full knowledge that a) TDD had employed Cahall and compensated Cahall to provide real estate brokerage services on TDD's behalf from 2009 through 2016, b TDD had full knowledge that Cahall was not licensed to provide such services and c) these actions in forming and performing the alleged employment contract with Cahall violated multiple criminal statutes within the Maryland Real Estate Brokers Act, Defendants again grossly failed to advise or inform Cahall or Pieterse that the facts surrounding the employment agreement and rendered the agreement between Cahall and TDD illegal, void and unenforceable;

29.    And yet again, Defendants failed to advise Pieterse of their discussions with Cahall or their knowledge that TDD had engaged in criminal misconduct and violated several Maryland statutes in forming and performing the core "employment contract";

30.    On May 21, 2018, Cahall recrafted the potential settlement offer and emailed it

to Cavenee. The offer included plaintiffs and defendants entering into a non-disclosure agreement regarding TDD's and its owners/officers' criminal misconduct;

31.     On May 21, 2018, Cavenee again replied that the issues remained the same and that G&S could not ethically assist Cahall, making it at least the fourth time, Defendants had TDD's criminal misconduct and statutory violations laid before them and still failed to advise or inform Cahall or Pieterse of the highly viable and strong defense of illegal contract that Plaintiffs had. And again, Defendants did not inform Pieterse of the issues being discussed;

32.     Instead, G&S just kept billing the Plaintiffs tens of thousands of dollars in allegedly proper legal fees;

33.     During this same period, on April 15, 2018, TDD filed its first amended complaint adding one count, Count VII, alleging Trademark Infringement against Cahall, Pieterse and HMRP (hereinafter referred to as "First Amended Complaint" and attached hereto as Exhibit C);

34.     Count VII alleged that TDD had been trading under the trademark "Healthmed Realty Partners since at least 2013", but beginning in 2015, Cahall and Pieterse misappropriated TDD's "exclusive" trademark and began diverting checks made out to Healthmed that TDD claimed were its property. TDD's alleged "ownership" of the disputed trademark was essential to TDD's "proof" that it owned the financial instruments allegedly converted by Cahall;

35.     After Cahall received the Amended Complaint from G&S and had ample opportunity to review it, Cahall emailed Cavenee on April 23, 2018, and informed Defendants that in 2013 TDD had received a cease-and-desist letter from another real estate brokerage company, Healthmed Realty, Inc. ("HRI"), another real estate brokerage and management company. HRI claimed that it had registered the trademark with the United States Patent and Trade Office ("USPTO") in 2011 and therefore owned the tradename. HRI demanded TDD cease using the name immediately, which TDD did not do. Consistent with Defendants refusal to recognize and pursue the illegal contract defense, Defendants expressed to Cahall, via email, no real interest in the claim of trademark ownership by another real estate brokerage company;

36.     On April 25, 2017, Cahall emailed Cavenee a copy of the HRI's USPTO federal

registration of the trademark, Healthmed Realty. The registration application was filed by HRI on May 2, 2011, and approved by USTPO on December 27, 2011, approximately 2 years before TDD claimed in its Amended Complaint that it began using the trademark (See copy of federal registration emailed to Cavenee attached hereto as Exhibit D). Via email to Cavenee, Cahall demanded that Defendants seek to have the new Count VII dismissed and told Cavenee that he believed that TDD needed to own the trademark to sustain a trademark infringement claim;

37.    In response, Cavenee emailed Cahall on April 26, 2018, and represented to Cahall that G&S had experience with trademark infringement cases, that TDD had a common law claim to the trademark in dispute and that the matter was best left for a future summary judgment motion or to be dealt with at trial;

38.    At no time did Defendants inform Plaintiffs that the facts as alleged by TDD, the specific terms of the Lanham Act, the overwhelming case law and the existence of the federal trademark registration of the disputed trademark by HRI two years before TDD first claimed to use the trademark, meant, as a matter of law, that TDD did not own the trademark and had no standing to bring a trademark infringement claim and no right to exclusively use it or prevent Plaintiffs from using it in their construction business, HMRP, and no ability to meet the burden of proof they had to succeed with a trademark claim against Plaintiffs;

39.    Not only did Defendants fail to move to dismiss TDD's Count VII, Defendants never moved for summary judgment regarding the trademark infringement claim and failed to secure a true copy of the USPTO registration of the trademark by Healthmed Realty, Inc. prior to trial which commenced on March 11, 2019, something Plaintiffs accomplished after the judgment within 190 days and an paying a $30.00 fee;

40.    At trial, Defendants never raised the fact that Healthmed Realty, Inc. had federally registered the trademark long before TDD testified at trial that it began using the trademark and, therefore, did not own the trademark and had no right to its exclusive use or to protect the trademark;

41.    Also, during the trial, Tyler testified under oath multiple times that:

      a.  TDD knew Cahall was not licensed to provide real estate brokerage services when TDD "hired" Cahall;

   b. TDD knew that Cahall remained unlicensed
      to provide real estate brokerage services from 2009 through 2016;

   c. Cahall worked on between 12 and 15 real estate brokerage transactions
      per year for TDD from 2009 through 2016;

   d. TDD made over 200 separate real estate commission payments to Cahall
      from 2009 through 2016, said payments totally over $500,000;

42.      TDD's long time agent and shareholder, Joseph Donegan, testified and trial and
corroborated most of Tyler's testimony referred to in the paragraph immediately above;

43.      In addition, during trial, TDD's counsel offered into evidence multiple documents
that detailed the dozens of real estate brokerage transactions Cahall worked on for TDD
from 2009 through 2016 and the nearly 200 commission payments TDD made to Cahall
during that same period;

44.      Despite TDD admitting throughout the trial to facts that conclusively proved that
the alleged contract with Cahall violated multiple criminal statutes multiple times from
2009 through 2016, Defendants did not once raise the illegality of TDD's alleged
foundational agreement with Cahall;

45.      The only attempt TDD's counsel and TDD made to cover up its illegal, criminal
conduct was to claim that TDD had a licensed agent work with Cahall most of the time,
implying that this somehow exempted TDD from the plain language prohibitions of the
law, of course while offering no legal support for this intentional deception;

46.      Unfortunately for the Plaintiffs, Defendants lent more than tacit approval to the
smoke screen TDD and its counsel had employed by a) not raising the illegality of the
agreement and b) by asking, and then not rebutting, Donegan during cross examination
(by Andres who had become an additional attorney of record for Plaintiffs earlier in the
litigation) if Cahall was licensed to which Donegan replied that Cahall was not, but then
explaining that is why Donegan had to work with Cahall, thus offering a non-existent
exemption to TDD's otherwise clear and gross violation of Maryland law;

47.      In response to Donegan's false testimony, Andres changed the subject
and remained silent as to the illegal contract issue or the statutory prohibitions relevant
thereto or that "working" with or even "supervising" a person while they are providing real

estate brokerage services, does not absolve one from the criminal conduct they are
engaging in;

48.      During closing arguments, counsel for TDD argued repeatedly that the alleged
employment contract between TDD and Cahall was valid and enforceable which
Defendants made no attempt whatsoever to rebut;

49.      During closing arguments, TDD's counsel argued that TDD and not Plaintiffs
owned the disputed trademark without Defendant arguing that HRI owned the trademark;

50.      On July 9, 2019, the trial court issued its Opinion and Order (as amended
March 30, 2020) ("Opinion"), attached hereto as Exhibit E. The trial court found that a
legal contract dating back to 2009 did exist between TDD and Cahall and Cahall
breached that contract. The trial court also found that TDD did have the exclusive right to
use and protect a trademark, that it did not own;

51.      However, the first seven lines of the Opinion perhaps most exemplifies the
catastrophic damage that an incompetent attorney can cause a client, that the Defendants
negligence, breach of duty, malpractice and over all collective professional incompetence
caused Plaintiffs, damage that multiplies daily as Pieterse struggles to deal with the
emotional, physical and financial turmoil of bankruptcy that the trial court judgment forced
her into, and the ongoing fight to fend off the criminal wrongdoers, TDD, from taking her
home:

> "Jeffrey Cahall began a business relationship with Tyler, Donegan, Duncan, Real
> Estate Partners, L.L.C. (TDD) in 2009. At that time, TDD was engaged in commercial
> real estate and leasing brokerage. Cahall had no brokerage license but was tasked with
> seeking out business for TDD. He worked with a broker, Joseph Donegan. Upon
> settlement, Cahall and Donegan would share the commissions, and TDD would receive
> the remainder. TDD paid Cahall a draw against the commissions at the rate of $75,000
> per year. As he earned commissions, the draw balance would be reduced.

52.      The trial court found that TDD had in fact engaged an unlicensed person
to provide real estate brokerage services on TDD's behalf and that TDD had
compensated that unlicensed person with a split of the real estate commissions
TDD had earned from the brokerage services that unlicensed person had performed
for TDD; a finding that a competent counsel would have "nipped in the bud" at the
outset of the litigation;

53.      After the judgment, Plaintiffs were alerted to Defendants' incompetence

(a general term used to conveniently describe the overall failings of Defendants) and within just a few days after the judgment was rendered asked Cavenee why they had not informed Plaintiffs that the alleged contract was illegal;

54.    Not surprising, Cavenee became defensive and indicated he had and a meeting was held between Plaintiffs and Defendants to discuss the situation, prepare a motion to alter or amend judgment and the outstanding, but disputed attorney's fee G&S claimed was owing. The primary objective of both parties was to draft and submit the motion to alter or amend judgment by July 19, 2019, along with a motion to stay enforcement of the judgment until the motion to amend could be heard and decided;

55.    After much discussion, G&S conceded to Plaintiffs' demands and included the illegal contract argument in the motion to alter or amend, but even that was a subpar effort by G&S;

56.    Plaintiffs were demanding a vigorous and well researched argument regarding the illegal contract issue, however, G&S clearly did not see that to be in their best interests. What Plaintiffs got from G&S was a truncated argument that looked like it had been dictated while driving. G&S failed for example to cite Thorpe v. Carte, a Maryland case of significant precedential value and directly on point with the facts of the case at hand. Despite objections from Plaintiff, G&S submitted the motion with an inadequate illegal contract argument;

57.    The trial court scheduled a hearing on the motion to alter or amend for October 15, 2021. Cahall met again with Cavenee and Weddle to discuss the issues at hand, including G&S's outstanding bill and their offer to "substantially reduce the balance due".

58.    At that meeting, Cahall repeated Plaintiffs' concerns regarding the competency of G&S's counsel but was direct and clear that Plaintiffs believed G&S had failed in their duties owed Plaintiffs, breached their contract and were generally negligent. Cahall reminded Defendants that Cahall had discussed the misconduct by TDD several times with them dating back to 2017. Cavenee denied this until Cahall showed him two of the emails. Cavenee and Weddle then tried to

convince Cahall that the retainer agreement Plaintiffs had signed gave G&S the right to direct the litigation and that they had no duty to inform the clients of the illegal contract. In Cavenee's precise words, "We weren't headed in that direction."

59.     After much wrangling and posturing, G&S to inform its liability carrier and that a claim for malpractice would be made, at this point, Cavenee said they may be open to reducing the outstanding balance by 50% or more. When Cahall responded that he would have to speak with Pieterse about that, but that any payment (which G&S was demanding to proceed with the October 15 hearing) that may be made would not include a waiver of Plaintiffs' rights to sue G&S. At this point, Weddle said emphatically that G&S would only agree to a reduction if the Plaintiffs released G&S from liability, and this a position taken by who were still Plaintiffs' attorneys.

60.     Cahall and Cavenee did agree, after the meeting, that Plaintiffs would pay G&S $10,000 the following week to see the matter through the hearing, Plaintiffs being in a difficult position with the timeframes short and issues complicated. However, Plaintiff was not thereby waiving their rights to sue Defendants or dispute the fee which Plaintiffs had contended was unreasonable;

61.     When G&S did not receive the $10,000 on Monday, Cavenee emailed Cahall that they were withdrawing. While that was not the deal struck, Plaintiffs eventually understood that G&S had no intention assisting Plaintiffs but were only interested in protecting the Defendants from their obvious malfeasance and dismissed G&S.

62.     The October 15 hearing was rescheduled for January 30, 2020, and Plaintiffs represented themselves from that point on;

63.     Additionally, throughout the litigation, Plaintiffs questioned the amount of G&S's invoices. After reviewing the bills in detail, Plaintiffs believe the bills were significantly "padded" with work that was not necessary or completed and work that could not have taken as long as the hours billed;

64.     Moreover, while the entire total fees billed Plaintiffs is less than

$300,000, before any challenge or proper audit, Pieterse has personally paid G&S over $150,000 in attorneys fees, much more than her proportionate share.

65.     G&S has not detailed its billings to each Plaintiff, however, the retainer agreement does not contain language that each Plaintiff is responsible for the entire attorney's fees charged, including fees attributable the other defendants, Cahall, HMRP and Robinwood LLC, does not provide that the Plaintiffs are jointly or severally responsible for one another attorney's fees, and has Pieterse never agreed to be responsible for the attorney's fees incurred by these other defendants. It is clear, therefore, that Pieterse has been overbilled already and G&S' Proof of Claim in the matter herein for an additional $137,000 is egregious and unwarranted and not owed.

## COUNT 1 – BREACH OF CONTRACT

66.     Plaintiffs incorporate herein Paragraphs 1 – 65 herein;

67.     Plaintiffs and Defendants had a contract of employment at all times relevant hereto under which G&S and its individual attorneys that represented and advised Plaintiffs, including Cavenee, Weddle, Remus and Andres owed duties of loyalty and fidelity to Plaintiffs and had an obligation to provide Plaintiffs with competent, unconflicted legal advice;

68.     Defendants each failed to perform their professional obligations with a standard of care and diligence and competency required under the contract and acceptable in the marketplace or industry and as required by their contract with Plaintiffs;

69.     As a result of Defendants Breach of Contract, Plaintiffs have suffered extraordinary damages, not limited to the judgments rendered by the trial court in Case No. 10-C-17-000401, but including extreme emotional distress, pain and suffering, costs associated with and caused by the filing of bankruptcy, damage to reputation and credit, loss of business, among other damages.

70.     Plaintiffs performed their obligations under the contract;

WHEREFORE, Plaintiffs respectfully prey:

    1. That Plaintiffs be awarded compensatory damages, special damages and disgorgement of fees against Defendants in an amount exceeding $75,000;

    2. That Plaintiffs be award the costs of this litigation;

    3. And for such other relief as this Court deems equitable

## COUNT II - LEGAL MALPRACTICE

71.      Plaintiffs incorporate herein Paragraphs 1 – 70 herein;

72.      Plaintiffs employed Defendants to provide competent legal representation regarding the TDD lawsuit;

73.      Defendants owed Plaintiffs a reasonable duty of care to Plaintiffs, but neglected their duty;

74.      Defendants' negligence and malpractice resulted in and was a proximate cause of loss to Plaintiffs;

WHEREFORE, Plaintiffs respectfully prey:

    1. That Plaintiffs be awarded compensatory and special damages and disgorgement of fees against Defendants in an amount exceeding $75,000;

    2. That Plaintiffs be awarded the costs of this litigation;

    3. And for such other relief as this Court deems equitable.

## COUNT III - BREACH OF FIDUCIARY DUTY

75.      Plaintiffs incorporate herein Paragraphs 1 – 70 herein;

76.      As a duly constituted and recognized law firm and as individually licensed attorneys, G&S and the remaining defendants had a fiduciary duty to Plaintiffs that required them, collectively and individually, to act in the best interests of Plaintiffs and to not act *in* ways that were contrary to the interests of to their employers, Plaintiffs;

77.     Defendants individually and collectively breached their fiduciary duty owed:

78.     As a result of Defendants' breach of the fiduciary duty they owed Plaintiffs, Plaintiffs have been harmed and damaged;

WHEREFORE, Plaintiffs respectfully prey:

      1. That Plaintiffs be awarded compensatory and special damages against Defendants and disgorgement of fees in an amount exceeding $75,000;

      2. That Plaintiffs be awarded the costs of this litigation;

      3. And for such other relief as this Court deems equitable.

## COUNT IV - EXCESSIVE FEES

79.     Plaintiffs incorporate herein Paragraphs 1 – 70 herein;

80.     Independent of the other Counts herein, Defendants consistently and continuously billed and/or attempted to bill Plaintiffs for legal fees either not owed, not necessary, not incurred, not reasonable and/or not in accordance with the contract between Plaintiffs and Defendants;

WHEREFORE, Plaintiffs respectfully prey:

      1. That Plaintiffs be awarded compensatory against Defendants and disgorgement of fees in an amount exceeding $75,000;

      2. That Plaintiffs be awarded the costs of this litigation;

      3. And for such other relief as this Court deems equitable.

## COUNT V – WRONGFUL ATTEMPT TO COLLECT
## A DEBT NOT OWED

81.     Plaintiffs incorporate herein Paragraphs 1 – 70 herein;

82.     Defendants have been fully paid attorney's fees attributable to

their representation of Plaintiff Pieterse (contested in total elsewhere herein);

83.    Despite their knowledge that Pieterse has paid all the fees she owes Defendants, Defendants knowingly and intentionally and maliciously filed a false Proof of Claim in this matter against Pieterse to harass and intimidate Plaintiff and collect a debt Defendants knew was not owed:

84.    Defendants have violated federal and state statutes by attempting to collect a non-existent debt;

85.    Defendants have therefore intentionally caused Plaintiff harm and damages;

WHEREFORE, Plaintiff respectfully prey:

1. That Plaintiff be awarded compensatory against Defendants in an amount exceeding $75,000;

2. That Plaintiff be awarded punitive damages against Defendants in and amount exceeding $75,000;

3. That Plaintiff be awarded the costs of this litigation;

4. And for such other relief as this Court deems equitable

## JURY TRIAL

Plaintiffs demand that this Adversary Proceeding be tried before a jury of their peers.

Respectfully submitted,

Jacqueline K. Pieterse, pro se
8751 Pete Wiles Road
Middletown MD 21769
301-676-6763
jgoldsmd@comcast.net


Jeffrey M. Cahall
8751 Pete Wiles Road
Middletown MD 21769
301-305-4031
Cahall_titan@hotmail.com